# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Dorisene Anderson,

                              Plaintiff,

                                              Civ. No. 04-3420 (RHK/AJB)
                                              **MEMORANDUM OPINION
                                              AND ORDER**

v.


Target Corporation,

                              Defendant.


Roy D. Hawkinson, Hawkinson Law Office, Minneapolis, Minnesota, for Plaintiff.

Joseph G. Schmitt and Sandra L. Jezierski, Halleland Lewis Nilan & Johnson P.A., Minneapolis, Minnesota, for Defendant.


## INTRODUCTION

Plaintiff Dorisene Anderson's employment was terminated by Defendant Target Corporation ("Target") on January 6, 2004. Anderson claims that her employment was terminated and that she suffered several other adverse employment actions due to her race. Target now moves for summary judgment with respect to Anderson's claims. For the reasons set forth below, the Court will grant Target's motion.

## BACKGROUND

### A.       Anderson's Position as a Cash Reconciliation Associate

In early June 2001, Anderson applied for her first job with Target and interviewed

with Carrie Fox, Jodi Sturm, and Cathy Harrington.  (Anderson Dep. Tr. at 29-31.)   On June

11, 2001, Anderson began working as a Cash Reconciliation Associate and reported to

Sturm, Cash Reconciliation Supervisor, who in turn reported to Fox, Manager of the Cash

Reconciliation Department.  Anderson's starting salary was $14.50 per hour.  (Id. at 40.)  In

January 2003, Fox transferred to a new position in the Accounts Payable ("AP")

Department and was replaced by Bruce Jonason.  (Id. at 31, 38-39; Fox Dep. Tr. at 38.)

Cash Reconciliation Associates balance the cash accounts for the individual stores

owned by Target, including the Target, Marshall Field's, and Mervyn's brand stores.  (Fox

Dep. Tr. at 10.)  Each Target store deposits funds into a cash account on a daily basis.  (Id.)

Cash Reconciliation Associates reconcile these cash accounts as well as the stores'

disbursement accounts, payroll accounts, and accounts payable.  (Id. at 9-10.)

During her time as a Cash Reconciliation Associate, "there were times when

[Anderson] would call in late due to sickness or . . . issues like that."  (Id. at 13.)

Supervisors at Target were "working with [Anderson] on . . . her attendance, to make sure

that it was consistent and on time."  (Id. at 23.)  However, Anderson "did the reconciliations

and did them timely and researched issues when needed."  (Id. at. 29.)

In January 2003, Fox promoted Anderson to Senior Cash Reconciliation Associate

and Anderson received a salary increase and an increase in grade level.  (Anderson Dep. Tr.

2

at 40.)  This promotion was given to every employee working in Anderson's department.

(Id. at 284-85.)  Anderson's job duties remained the same, although she was given more

difficult accounts.  (Id. at 285-86.)

According to Anderson, on May 21, 2003, two of her co-workers, Virginia Gerdes

and Sandy Waite, told Anderson that she was violating the dress code by wearing capri

pants.  (Id. at 47.)  Anderson also claims that these coworkers stated that "because

[Anderson] was an African-American [she] thought [she] could wear what [she] wanted to."

(Id. at 46.)  Anderson also asserts that Waite told her that she "had it made because [she]

was an African American person and a black woman."  (Id. at 47.)  Anderson asserts that

other employees were wearing similar capri pants but were not told that they were in

violation of the dress code.  (Id. at 52-53.)

Because of the incident with Gerdes and Waite, Anderson began wearing suits to

work.  (Id. at 53.)  However, one month later, on either June 16 or 17, Anderson again wore

capri pants.  (Id. at 54.)  On that day, Jonason approached Anderson and told her she was

violating the dress code.  (Id. at 54.)  On June 17, 2003, Anderson sent an e-mail to Ann

Florell, Human Resources Group Manager, stating:

> My high tolerance level has been injur[ed] by harassment of my co-workers.
> Moreover, a co-worker approached me verbally and with a copy of the company's
> dress code policy regarding a pants suit that I was wearing.  This has created a hostile
> environment in the department.  In respect, I would have appreciated my supervisor
> or my manager to address the company's dress code policy instead of a co-worker.

(Schmitt Aff. Ex. B at Ex. 9.)  Anderson requested assistance from Florell on this matter;

Florell asked Dana Derouin Bratsch, Associate Human Resources Representative, to

investigate Anderson's complaint of harassment.  (Schmitt Aff. Ex. H; Florell Dep. Tr. at 42.)

Bratsch's investigation found no evidence of either racial or other forms of harassment.  (Florell Dep. Tr. at 29, 42.)  However, Jonason met with both Gerdes and Waite and told them to bring future concerns to a supervisor rather than address them directly with co-employees.  (Gonsior Aff. ¶ 3.)  Bratsch also met with Waite and discussed valuing all types of diversity and Target's harassment policy.  (Id.)  Anderson was not disciplined for a dress code violation.  (Anderson Dep. Tr. at 77.)

**B.     Anderson's Transfer to the Position of Purchase Journal Specialist**

The affidavit attached to Anderson's EEOC charge stated that "I made a request to transfer to a new department because I felt harassed and uncomfortable in my previous department.  I felt that I was not valued as an African American employee of the Target Corporation."[1]  (Anderson Dep. Tr. at 85; Hawkinson Aff. Ex. B at Ex. 12.)  Florell set up exploratory interviews between Anderson and several Human Resource Directors to evaluate Anderson's "skill set" and to identify other job opportunities for Anderson within Target.  (Florell Dep. Tr. at 42-44; Schmitt Aff. Ex. H.)

On July 14, 2003, Florell met with Anderson and discussed several potential positions for her, including positions in the Human Resources Department and the

------

[1]Anderson later testified at her deposition that "[she] was transferred without asking to be transferred." and that "[she] didn't make a request to transfer.  [She] was told [she] was found a job."  (Anderson Dep. Tr. at 86.)

Distributions Department.  (Florell Dep. Tr. at 45-46.)  Florell also provided Anderson with

a copy of a posting for an opening as a Purchase Journal Specialist in the AP Department.

(Anderson Dep. Tr. at 87; Hawkinson Aff. Ex. F.)  The principal duties and responsibilities

of a Purchase Journal Specialist include:

> • Researching and correcting the weekly stock ledger, general ledger and FIRM
> kickouts;
> • Researching and reconciling the clearing account and balance sheets;
> • Developing strong partnerships and networks with all areas of A/P and resolving
> issues that affect the purchase journal; and
> • Responding, addressing and resolving PMU issues for other areas.

(Fox Dep. Tr. at 76-77; Schmitt Aff. Ex. F. at Ex. 1.)  Anderson told Florell that she would

"never" have requested a transfer to Purchase Journal Specialist on her own.  (Anderson

Dep. Tr. at 87.)  However, Florell told her that both Florell and another employee in

Target's Human Resources Department, Dan Casperson, thought she should take the

position.  Anderson accepted the position and transferred on July 18, 2003.[2]  (Anderson

Dep. Tr. at 88.)  Anderson's salary of $17.16 per hour remained the same after the transfer.

(Anderson Dep. Tr. at 93.)

     During 2003, the Purchase Journal team consisted of five Purchase Journal

Specialists, three of whom were specialists for the Target brand stores and two of whom

were specialists for the Marshall Field's/Mervyn's brand stores.  (Gonsior Aff. ¶ 6.)

––––––––––––––––––––––––––

[2]Anderson was told she could "post[] out" of the Purchase Journal Specialist
position after six months.  (Florell Dep. Tr. at 68-69; Anderson Dep. Tr. at 88.)  This meant
that, under Target policy, Anderson had to stay in her position for six months before she
could transfer to another position in Target.  (Florell Dep. Tr. at 68-69; Anderson Dep. Tr.
at 94.)

However, each Purchase Journal Specialist supported a different area of the Target Corporation. (Gonsior Dep. Tr. at 29-30; Johnson Dep. Tr. at 17-18.) Consequently, each Purchase Journal Specialist had different functions, and the Marshall Field's/Mervyn's specialists had substantially different job functions than the Target specialists. (Johnson Dep. Tr. at 15-18; Nielson Dep. Tr. at 40-41.)

Anderson was hired as the Purchase Journal Specialist for the Marshall Field's and Mervyn's brand stores. (Johnson Dep. Tr. at 32.) She reported to Ann Cameron, the supervisor of the Purchase Journal Department, from July 2003 until November 2003. (Fox Dep. Tr. at 36-37; Gonsior Dep. Tr. at 32.) In November 2003, Cameron transferred to a new position and was replaced by Jennifer Weber. (Fox Dep. Tr. at 40.) Cameron and Weber reported to Fox. (Fox Dep. Tr. at 38.)

## C.    Anderson's Training as a Purchase Journal Specialist

AP supervisors and managers are responsible for training Purchase Journal Specialists. (Florell Dep. Tr. at 9-10.) A new Purchase Journal Specialist requires approximately one year to master the job functions and understand the impact the position has on other areas. (Gonsior Dep. Tr. at 111-12, 114; Anderson Dep. Tr. at 426.) A training department provides technical computer training and supports departments in providing specific training to its group. (Florell Dep. Tr. at 10.) The training department also offers classes on specific computer programs that are available to everyone. (Id. at 9-10; Johnson Dep. Tr. at 23.) Fox also maintained an "open-door policy" in which team members could come to her with their questions or concerns. (Fox Dep. Tr. at 58.)

6

Anderson's predecessor, Julie Johnson, personally trained Anderson in her job functions as a Purchase Journal Specialist.  (Johnson Dep. Tr. at 21-22.)  Because Johnson had developed the procedures of the position herself, she did not provide Anderson with a manual or notes.  (Id. at 22.)  Initially, Johnson trained Anderson daily for varying lengths of time.  (Id. at 24-25, 31-32, 36-40.)  Later, Anderson would come to Johnson outside of the training periods with specific questions.  (Id. at 40.)  Due to their differing job functions, the Purchase Journal Specialists had little opportunity to cross-train each other, particularly between Target and Marshall Field's/Mervyn's specialists.  (Id. at 40-41.)

Anderson also requested, and received, additional training from Cameron on a daily basis.[3]  (Gonsior Dep. Tr. at 22-23, 31-32; Fox Dep. Tr. at 37-38, 41, 49; Schmitt Aff. Ex. F. at Ex. 3.)  Anderson received twenty-one half-hour training sessions, for ten hours of training total.[4]  (Hawkinson Aff. Ex. J. at Ex. 7.)  In the Fall of 2003, Anderson's personal training ended when she indicated she no longer needed it.  (Fox Dep. Tr. at 65; Schmitt Aff. Ex. F. at Ex. 3; Anderson Dep. Tr. at 240.)  Finally, Anderson regularly took advantage of Fox's open-door policy "if not every day, every other day" by frequently coming to Fox with questions.  (Fox Dep. Tr. at 57-59, 62-63, 95-96, 126.)

---

[3]No other individuals in the department received one-on-one training from their supervisors.  (Gonsior Dep. Tr. at 23.)

[4]Dave Nordby, a Caucasian male, received 14 on-the-job, one-on-one training sessions from his predecessor ranging from 1-3 hours for a total of 25 hours.  (Schmitt Aff. Ex. F. at Ex. 11).

Anderson's team members complained that she would get upset and accuse them of lying when they did not know the answers to her questions. (Gonsior Dep. Tr. at 89-91, 100; Fox Dep. Tr. at 94-95.) In response to this, Fox instructed Anderson to direct her questions to Fox or Cameron. (Gonsior Dep. Tr. at 100-02, 104-06; Schmitt Aff. Ex. D at Ex. 21; Fox Dep. Tr. at 96; Schmitt Aff. Ex. F. at Ex. 3.)

**D.     Anderon's Disclosure of a Severance Offer**

In August of 2003, Anderson met with Florell and told her that she was not receiving the help she needed to succeed and that she continued to be harassed. (Anderson Dep. Tr. at 94-95.) Specifically, Anderson stated that one of her supervisors had referred to her as the "dress code queen." (Id. at 96.) Anderson asked Florell if Target would offer her a severance package. (Id. at 94-95.) Florell offered Anderson six weeks of full pay and full benefits while Anderson searched for a new job. (Florell Dep. Tr. at 70-72.) Anderson decided to think about the offer and Florell asked her to keep it confidential. (Id. at 71.) However, Anderson discussed the offer with several co-employees and, as a result, Florell withdrew the offer on August 8, 2003. (Id. at 72-73.) Anderson became upset and Florell asked her to go home for the day. (Id. at 95.) Anderson "refused" to go home because "[she] did not feel [she] had d[one] anything wrong" and returned to work. (Id. at 95; Anderson Dep. Tr. at 109; Schmitt Aff. Ex. B. at Ex. 12.) Anderson was not disciplined for the incident. (Gonsior Aff. ¶ 11.)

**E.     Anderson's Perfume**

On October 27, 2003, Anderson invited Jan Lindstrom to her desk to show her some perfume purchased while on vacation.[5]  (Schmitt Aff. Ex. B. at Ex. 12.)  Lindstrom told Anderson that she was allergic to perfume and asked Anderson to wear less perfume and that it made her ill.  (Anderson Dep. Tr. at 293-94, Schmitt Aff. Ex. B. at Ex. 12; Fox Aff. ¶ 3.)  Anderson stated that she had been wearing the perfume for years.  (Schmitt Aff. Ex. B. at Ex. 12.)  Lindstrom thereafter returned to her desk.  (Id.)  Anderson continued to wear perfume to work.  (Anderson Dep. Tr. at 302.)

On December 2, 2003, Lindstrom approached Anderson and asked Anderson to reduce the amount of perfume she was wearing because it was "invading her space" and she was becoming physically ill.  (Anderson Dep. Tr. at 293-96; Gonsior Dep. Tr. at 133-34.)  Anderson told Lindstrom that if she had a problem, she should speak with Human Resources.  (Gonsior Dep. Tr. at 133-34; Anderson Dep. Tr. at 297.)  Lindstrom turned on her personal fan, pointed it at Anderson, and left the area.  (Anderson Dep. Tr. at 303; Schmitt Aff. Ex. F. at Ex., 6.)  Anderson sent an email to Fox stating that, because of a medical condition, the fan was causing her hands to get cold.  (Anderson Dep. Tr. at 304; Schmitt Aff. Ex. F. at Ex. 6.)

---

[5]Prior to this incident, Anderson and Lindstrom had a poor relationship.  (Gonsior Dep. Tr. at 89.)  Anderson stated that on October 10, 2003, she asked Lindstrom for help with one of her accounts.  Lindstrom said she was too busy to help her.  "Two seconds later she got up and went to Julie Johnson's desk and stated that she hated when people act like they know what they're doing and they don't know anything and are always asking questions."  (Hawkinson Aff. Ex. 12).

In response to Anderson's e-mail to Fox, Human Resources had Lindstrom's fan turned off. (Anderson Dep. Tr. at 304-08.) Hillary Gonsior, Senior Human Resource Representative, informed Anderson that she had spoken with Lindstrom and that "further action would be taken" against Lindstrom if she continued to use her fan. (Gonsior Dep. Tr. at 142-43; Anderson Dep. Tr. at 311-12.) Gonsior also told Anderson to direct future questions to her. (Anderson Dep. Tr. at 310.)

On several occasions, Lindstrom used a different cubicle to avoid Anderson's perfume. (Gonsior Dep. Tr. at 135-36; Fox Dep. Tr. at 55-56.) Fox also met with Anderson several times in December and asked Anderson to reduce the amount of perfume she was wearing. (Fox Dep. Tr. at 53-55.) Anderson requested that Fox supply her with a written policy that prohibited her from wearing perfume. (Id. at 54-55.) Anderson did not alter the amount of perfume she wore. (Anderson Dep. Tr. at 302.)

On December 11, 2003, Johnson told Anderson that Lindstrom "had it in" for her. (Johnson Dep. Tr. at 53; Gonsior Dep. Tr. at 51; Schmitt Aff. Ex. D. at Ex. 5). Lindstrom apparently had never said that she "had it in" for Anderson; Johnson was expressing her opinion of Lindstrom's feelings. (Johnson Dep. Tr. at 53; Gonsior Dep. Tr. at 51; Anderson Dep. Tr. at 153.) Johnson testified that "[Lindstrom] was upset with [Anderson] because [she] sent an e-mail to [] Fox saying that [Lindstrom] and [Johnson] were talking about [her]" and that "[she thought] that would tick most people off." (Johnson Dep. Tr. at 52; Schmitt Aff. Ex. I. at Ex. 7.) Johnson later testified that she chose her words poorly and

10

made the comment because "[t]he work environment was very tense for [her]. [She] just wanted [Anderson] to back down." (Id. at 53.)

On December 17, 2003, Weber met with Anderson and requested that Anderson wear less perfume and refrain from refreshing her perfume at work. (Anderson Dep. Tr. at 313-14, 441-42.) Anderson again requested a written policy prohibiting her from wearing perfume at work. (Anderson Dep. Tr. at 315-16; Schmitt Aff. Ex. B. at Ex. 37.) Gonsior told Anderson her perfume was causing a disruption and asked that she stop wearing perfume. (Gonsior Dep. Tr. at 136-37.) Anderson responded saying that she intended to continue wearing the perfume. (Id.) On December 22, 2003, Gonsior warned Anderson that if she continued, she would be placed on corrective action. (Anderson Dep. Tr. at 445-47.)

**F.      Anderson's Termination**

On January 6, 2004, Anderson complained to Gonsior that Lindstrom had turned on

her fan.  (Gonsior Dep. Tr. at 177; Anderson Dep. Tr. at 335-36.)  Gonsior also received a

call from Weber and Fox requesting a meeting because Lindstrom and Karen May had

complained that Anderson's perfume was making them ill.  (Gonsior Dep. Tr. at 177-78,

184; Fox Dep. Tr. at 97-98; Schmitt Aff. Ex. F. at Ex. 4.)  Lindstrom had moved to another

cubicle to avoid Anderson's perfume.  (Fox Dep. Tr. at 97-98; Schmitt Aff. Ex. F. at Ex. 4.)

Gonsior walked through Anderson's area and could smell her perfume.  (Gonsior Dep. Tr.

at 178, 184.)  She then scheduled a meeting with Anderson.  (Gonsior Dep. Tr. at 178-79;

Schmitt Aff. Ex. F. at Ex. 4.)  At that time, she had no intention of disciplining Anderson.

(Gonsior Aff. ¶ 8.)

At the meeting, Gonsior told Anderson that several individuals had complained about

her perfume and that Anderson must either go home and remove her perfume or go home

for the day with pay.  (Gonsior Dep. Tr. at 179-90; Schmitt Aff. Ex. H at Ex. 16; Anderson

Dep. Tr. at 343, 347-48.)  Anderson resisted and at one point began to scream at Gonsior.

The screaming was loud enough that another Human Resources representative entered the

room to see whether Gonsior needed assistance.  (Gonsior Dep. Tr. at 179; Schmitt Aff.

Ex. H. at Ex. 16.)  Anderson told Gonsior she would not leave work.  (Gonsior Dep. Tr. at

180-81; Schmitt Aff. Ex. H at Ex. 16; Anderson Dep. Tr. at 348-50, 359-60.)  Gonsior

requested several times that Anderson go home and warned her that if she refused, she

would be terminated for insubordination.[6]   (Gonsior Dep. Tr. at 180-81; Schmitt Aff. Ex. H. at Ex. 16.)

Gonsior left the room, consulted with Florell, then returned and told Anderson she had one final opportunity to leave.  (Gonsior Dep. Tr. at 180-81; Schmitt Aff. Ex. H. at Ex. 16.)  Anderson refused and Gonsior terminated her for insubordination and gross misconduct.  (Gonsior Dep. Tr. at 182.)

After being told she was terminated, Anderson still refused to leave.  (Gonsior Dep. Tr. at 182; Schmitt Aff. Ex. H. at Ex 16; Anderson Dep. Tr. at 360-61.)  She remained in the meeting room for another hour, and then called 911 and, at her request, was transported to a hospital.  (Gonsior Dep. Tr. at 183; Schmitt Aff. Ex. H. at Ex. 16; Anderson Dep. Tr. at 182-83, 361-62; Schmitt Aff. Ex. B. at Ex. 40.)

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Cattrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50  (1986). The moving party bears the burden of showing that the material facts in the case are undisputed.  See Celotex, 477 U.S. at 322; Mems v. City of St. Paul Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and the

_____

[6]Target's Business Code of Conduct prohibits insubordination and provides that insubordination is a terminable offense.  (Gonsior Aff. ¶ 2.)

inferences that may be reasonably drawn from it, in the light most favorable to the non-

moving party. See Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir.

2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The non-

moving party may not rest on mere allegations or denials, but must show through the

presentation of admissible evidence that specific facts exist creating a genuine issue for

trial. See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th

Cir. 1995).

**ANALYSIS**

**A.     Anderson's Claim of Unlawful Termination**

Anderson alleges she was fired by Target in violation of Title VII. Under Title VII, it

is unlawful for an employer to discharge an individual "because of such individual's race."

42 U.S.C. § 2000e-2(a)(1). Where there is no direct evidence of discrimination, the

McDonnell Douglas burden-shifting framework is applied. Turner v. Honeywell Fed. Mfg.

& Techs., LLC, 336 F.3d 716, 720 (8th Cir. 2003) (citing McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 801-04 (1973)). Under this framework, a presumption of

discrimination is created when the plaintiff meets her burden of establishing a prima facie

case of employment discrimination. Rothmeier v. Inv. Advisers, Inc., 85 F.3d 1328, 1332

(8th Cir. 1996) (citation omitted). A minimal evidentiary showing will satisfy this burden

of production. Turner, 336 F.3d at 720 (citation omitted). Upon establishing a prima facie

case of discrimination, the burden of production shifts to the defendant to show that it had a

legitimate, nondiscriminatory reason for its actions. "Once this burden has been met, the

presumption of discrimination disappears, requiring the plaintiff to prove that the proffered

justification is merely a pretext for discrimination.  At all times, the burden of persuasion

remains with the plaintiff." Pope v. ESA Servs, Inc., 406 F.3d 1001, 1007 (8th Cir. 2005)

(citations omitted).

### 1.    Anderson's prima facie case

In order for Anderson to establish a prima facie case of discrimination, she must

show that: (1) she is a member of a protected group; (2) she was meeting Target's

legitimate job expectations; (3) she suffered an adverse employment action ; and

(4) similarly situated employees who were not members of the protected class were treated

differently.  Davis v. KARK-TV, Inc., 421 F.3d 699, 704 (8th Cir. 2005).  Target claims

that Anderson has failed to establish her prima facie case because she was not meeting

Target's legitimate expectations at the time of her termination and because she cannot

identify another similarly situated employee who was treated differently.  (Mem. in Supp. at

12-13.)

### a.    Target's Legitimate Job Expectations

Target argues that Anderson was not meeting its legitimate job expectations and that

Anderson was terminated for insubordination in violation of Target's Business Code of

Conduct.

Target first asserts that Anderson was insubordinate for refusing the directives from

supervisors and human resources personnel to reduce the perfume she wore at work.

Target also argues that Anderson was insubordinate because, on January 6, 2004, she

refused to follow Gonsior's instructions to either go home, shower to remove her perfume and return to work, or go home for the day with pay.  Anderson does not dispute that she was repeatedly asked to reduce the amount of perfume she was wearing, or that she refused to do so.  Nor does she dispute that she was warned by Gonsior that she would be placed on corrective action if she continued to wear her perfume.  Finally, Anderson does not dispute that she refused the directive to leave work on January 6, 2004.

Anderson's response is that "while she was in the [C]ash [R]econciliation [D]epartment before she was transferred to the A/P Department, she met Target's legitimate job requirements.  She received excellent remarks on her periodic reviews." (Mem. in Opp'n at ¶ N).  Receiving positive evaluations in a particular role, however, does not constitute evidence that one has met the legitimate expectations of an employer in a different role.  Zhuang v. Datacard Corp., 414 F.3d 849, 855 (8th Cir. 2005).  Anderson's assertion that she met Target's legitimate expectations as a Cash Reconciliation Specialist has no bearing on the question of whether she met Target's legitimate expectations when she was terminated, over one year later, from her position as a Purchase Journal Specialist. Furthermore, Anderson's argument does not dispute the direct charges that she was insubordinate or that Target does not have a legitimate business expectation she would follow legitimate directives and adhere to company policies.  Anderson has failed to show that she was complying with Target's legitimate expectations.

Anderson does claim that the entire perfume dispute was "the beginning of the plot to terminate her employment at Target in that this was a training issue that was changed into

16

a perfume issue, and the perfume issue is merely a pretext for Defendant's many

discriminatory acts towards Plaintiff." (Pl. Mem. ¶ K). Furthermore, Anderson contends

that Target's failure to provide adequate training was a "discriminatory business decision

that led to her termination." (Pl. Mem. ¶ H). In other words, Anderson appears to argue

that Gonsior's request that she remove her perfume was part of a larger practice of

discrimination to effect Anderson's termination. Anderson, however, presents no evidence

to support her allegation that the "perfume issue" was related to the "training issue."

Accordingly, Anderson has not met her burden of establishing she was meeting Target's

legitimate expectation.

### b.      Similarly Situated Employees

Target next argues that Anderson has failed to make a prima facie case because she

cannot identify a similarly situated employee who was treated differently than Anderson. In

an employment discrimination claim, the plaintiff must show that the employees outside of

plaintiff's protected group were similarly situated in all relevant respects. Pope, 406 F.3d

at 1009. Furthermore, "employees are similarly situated only when they are involved in or

accused of the same offense and are disciplined in different ways." Wheeler v. Eventis

Pharms., 360 F.3d 853, 858 (8th Cir. 2004). Therefore, Anderson must show that another

employee was accused of the same offense and disciplined in a different manner.

To fulfill this burden, Anderson alleges that:

On April 17, 2003, a Caucasian Target employee, Carol Maki, was asked to go home
for a day because of excessive body odor and tight clothing. She had received prior
coaching for these issues. She did not leave until after being asked three times. She

was instructed that when she received directions from her lead that she had to follow those instructions. Carol Maki was not discharged, but was given additional coaching. Carol Maki, a Caucasian, was not discharged whereas Dorisene Anderson, an African American, was discharged.

(Mem. in Supp. at 17 (citations omitted).)

Maki's situation differs considerably from that of Anderson. While both Anderson and Maki were approached regarding problems with odor in the workplace, Anderson was terminated for her response to Gonsior's instruction to leave work. Maki was given a similar instruction to leave work and responded that "she understood" and remained for several minutes speaking with her co-workers before she left.[7]  (Gonsior Dep. Tr. at 40.) Anderson, when asked to leave work, began to scream and remained for over an hour until she finally left in an ambulance. Because of these differences, Anderson has failed to show she was treated differently than a similarly situated employee.

Because Anderson has failed to establish either that she met Target's legitimate expectations or was treated differently than a similarly situated employee, she has failed to establish a prima facie case of employment discrimination.

### 2.    Anderson's Ultimate Burden of Establishing Pretext

Assuming arguendo that Anderson had succeeded in establishing a prima facie case of employment discrimination, she has nonetheless failed to establish that Target's

--------

[7]Maki was told three times to leave work. (Gonsior Dep. Tr. at 41.) Because of this, she received an instruction that she is to follow the directions of her supervisor. (Id.) Thereafter, she admitted she should have left immediately and stated she would do so in the future. (Id.)

proffered reason for terminating her, insubordination, was a pretext.  To establish pretext, a plaintiff must present evidence that "(1) creates a question of material fact as to whether the defendant's proffered reasons are pretextual and (2) creates a reasonable inference that [race] was a determinative factor in the adverse employment decision."  Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 921 (8th Cir. 2001).

Anderson's only statement regarding pretext is that: "[p]laintiff maintains that her termination from Target that was based upon perfume/insubordination was merely a pretext to conceal race discrimination."  However, Anderson's only argument that race was a motivating factor in her termination is her claim that Maki was treated differently under similar circumstances.  For the reasons previously stated, Maki was not a similarly situated employee to Anderson.  Accordingly, Anderson has failed to present evidence that creates a material fact that Target's proffered reason for terminating her was a pretext.

**B.      Anderson's Denial of Training**

Anderson also claims that she was denied proper employment training because of her race.  Target argues that Anderson has failed to demonstrate that the amount of training Anderson received subjected her to an adverse employment action.  An adverse employment action is "a tangible change in working conditions that produces a material employment disadvantage."  Davis, 421 F.3d at 706.  Examples of adverse employment actions are terminations, reductions in pay or benefits, and changes in employment that significantly affect an employee's future prospects.  Id.

19

Anderson has not presented evidence that she suffered an adverse employment action.  Anderson concedes that she received one-on-one training in her position from her predecessor and that she received one-on-one training from her superior.  She also has not identified a job function that she is unable to perform due to her lack of training. (Anderson Dep. Tr. at 195-96.)

Nor has Anderson identified a similarly situated individual who received more extensive training than she received.  Anderson proffers the training of David Nordby, who received twenty-five hours of one-on-one training from his predecessor, to show that she was not given the same training as a similarly situated employee.  However, Anderson received similar training from her predecessor.[8]  Furthermore, Anderson received ten hours of additional training from her supervisor, Cameron.  She was the only team member in her department who received such additional one-on-one training from her supervisor. (Gonsior Dep. Tr. at 23).

Anderson has failed to identify either an adverse employment action that she was subject to because of her training or a similarly situated individual who received more training than her.

**C.      Anderson's Transfer**

---

[8]Anderson also argues that she was not treated similarly to Nordby because she was not trained by the same person who trained Nordby.  Although this is true, both were trained by their predecessors.  (Fox Aff. ¶ 5; Anderson Dep. Tr. at 218-19.)

Anderson also claims she was discriminated against because of her race when she was transferred to her position as a Purchase Journal Specialist.  She asserts that she was transferred to a position she was not qualified for so that she would fail.  However, Anderson provides no evidence to support this allegation other than to state that she does not possess several of the minimum requirements of the position to which she transferred.[9]

Furthermore, Anderson's transfer did not amount to an adverse employment action. Anderson's pay grade, title, and compensation remained the same following her transfer. Finally, it was Anderson herself who requested the transfer which she now claims is discriminatory.  Accordingly, Anderson has failed to establish she was discriminated against because of her race when she transferred to a new position.

**D.     Harassment for Dress Code Violation**

Plaintiff claims that she was discriminated against after two team members told her she was violating Target's dress code by wearing capri pants.  However, Anderson has failed to allege an adverse employment action that resulted from this incident.  Anderson admits she was not disciplined for a dress code violation.  Furthermore, Target investigated the incident when she reported it.  Anderson only alleges that she was transferred because of the dress code violation.  For the reasons stated above, this transfer does not amount to an adverse employment action.  Therefore, Anderson has failed to show that she was

---

[9]Specifically, Anderson states that she does not have an accounting/business degree or equivalent Target AP experience, and that she did not have experience in all of the requisite computer programs required for the position.  (Mem. in Opp'n. at 19-20.)

discriminated against because of her race for either a dress code violation or because she reported the comments made toward her.

**E.     Anderson's Failure to Respond to Other Claims**

Anderson's Complaint also asserts claims for breach of contract, implied covenant of good faith and fair dealing, wrongful discharge, intentional infliction of emotional distress, and fraud, deceit and misrepresentation.  Target has outlined why summary judgment is appropriate for all of these claims.  Anderson has failed to respond to these claims either in her responsive brief or at oral argument.  Therefore, the court will grant Target's Motion for Summary Judgment on each of these claims.

**CONCLUSION**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS ORDERED** that Target's Motion for Summary Judgment (Doc. No. 47) is **GRANTED** and Plaintiff Dorisene Anderson's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: September 15 , 2006                     s/Richard H. Kyle
                                              RICHARD H. KYLE
                                              United States District Judge